**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**August 6, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.　　**2025AP758-FT**

**STATE OF WISCONSIN**

Cir. Ct. No. 1990ME124D

**IN COURT OF APPEALS**
**DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF D.S.:

RACINE COUNTY,

　　PETITIONER-RESPONDENT,

　V.

D.S.,

　　RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Racine County: JESSICA E.H. LYNOTT, Judge. *Affirmed.*

¶1 NEUBAUER, P.J.[1] D.S., referred to herein by the pseudonym Donna, appeals from orders extending her involuntary commitment by one year under WIS. STAT. § 51.20 and continuing involuntary medication and treatment during that time. Donna argues that the circuit court erred in determining that Racine County (the County) had proven that she is dangerous under the second, third, and fourth standards, § 51.20(1)(a)2.b., c., and d., and the recommitment alternative set forth in § 51.20(1)(am). Donna also argues that the court erred in finding that the County had proven that she received an adequate explanation of the advantages, disadvantages, and alternatives to the medications she is receiving involuntarily. For the reasons explained below, this court affirms the orders.

## BACKGROUND

¶2 Donna has a lengthy treatment history and has been involuntarily committed since 2006. In January 2025, the County filed a petition to extend Donna's involuntary commitment along with a memorandum from her case worker detailing Donna's commitment history and a report from Dr. Marshall J. Bales, a psychiatrist and licensed physician who has treated Donna for several years. In the petition, the County invoked WIS. STAT. § 51.20(1)(am), alleging that Donna was "dangerous because there is a substantial likelihood, based on [her] treatment record, that [she] would be a proper subject for commitment if treatment is withdrawn." Bales, in his examination report, opined that Donna was mentally ill and was dangerous under the second, third, and fourth standards under § 51.20(1)(a)2.b.-d., along with the recommitment alternative in § 51.20(1)(am).

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

¶3     The circuit court held a hearing on the County's petition on February 13, 2025, at which Bales and Angela Townsend, Donna's case manager, testified.  Bales testified that Donna has schizoaffective disorder, which he described as "a severe and persistent mental illness."  Bales testified that, during his examination, Donna displayed "manic features and psychotic features," presented as "[n]onsensical, manic, disorganized in thinking," exhibited "flight of ideas," and was "really vocal about wanting off of psychotropic medications."  He testified that he "truly [has] difficulty seeing how [Donna] could function" in an outpatient capacity and that she "was not at all giving [him] the impression that she would be stable" living by herself in a residence "for more than—at most, a day or so before there would be [a] police crisis or some other intervention."

¶4     The County also questioned Bales about his opinions concerning Donna's dangerousness under WIS. STAT. § 51.20.  Under the second standard for dangerousness, an individual is dangerous when he or she "[e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm …."  Sec. 51.20(1)(a)2.b.  Because Donna was committed involuntarily and receiving treatment at the time of the hearing, the County opted to establish dangerousness by showing "a substantial likelihood, based on the subject's individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn."  Sec. 51.20(1)(am).

¶5     When asked whether Donna met the second standard for dangerousness and whether there was a substantial probability that she would be a proper subject for treatment if treatment were withdrawn, Bales said she would be and further testified that Donna has "been known to be aggressive when she goes

off her medications" and that she "has been known to use street drugs." Bales acknowledged that Donna has not displayed "recent dangerousness" because of her medications but stated that absent continued commitment and medication orders, "this is going to get dangerous, and the only question is how." The only specific conduct that Bales referenced was an incident he learned of in her records in which Donna reportedly threw silverware "in the direction of a peer" the previous summer. On cross-examination, he reaffirmed his view concerning Donna's likely course of conduct if her commitment and medication orders did not continue, explaining that Donna would "stop her medications and become even more psychotic and symptomatic and will become dangerous in some way."

¶6 Under the third standard for dangerousness, an individual is dangerous if he or she "[e]vidences such impaired judgment … that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." WIS. STAT. § 51.20(1)(a)2.c. When asked whether Donna satisfied this standard, Bales responded, "Yes." The County did not specifically ask for, and Bales did not volunteer, a factual basis for this opinion.

¶7 Finally, under the fourth standard for dangerousness, an individual is dangerous if he or she "[e]vidences behavior … that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety … so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue" in the absence of prompt and adequate treatment. WIS. STAT. § 51.20(1)(a)2.d. When asked whether Donna satisfied this standard, Bales responded affirmatively, noting Donna's unwillingness to pursue voluntary mental health care and her desire to refrain from taking antipsychotic medications.

4

¶8      With respect to medication, Bales identified five medications in his report that Donna was receiving: Depakote, Clozaril, Geodon, Lamictal, and Cogentin.   In the report, Bales indicated he had discussed the following advantages of medication with Donna: "[s]tabilization of mood, improvement in reality orientation, improvement in sleep patterns, decrease in irritability and agitation, [and] decrease in anxiety."   He also indicated that he had discussed certain disadvantages, including weight gain, "occasional issues with movement … such as tremors, restlessness, or tardive dyskinesia; occasional mild sedation, [and] occasional gastrointestinal issues."   Finally, the report indicates that Bales also discussed several alternatives to medication with Donna, namely "[p]sychotherapy, group therapy, [and] stress management tactics."   Bales' report was received into evidence without objection.

¶9      At the recommitment hearing, Bales confirmed that he had explained to Donna the advantages, disadvantages, and alternatives to the recommended medication and treatment and agreed that, due to her mental illness, she is unable to express an understanding of those advantages, disadvantages, and alternatives. But Bales also expressed "alarm[]" that her medication regimen had been "left the same year after year."   He indicated that he had sought an explanation from her care providers for the lack of any medication changes but had not received any response.   In terms of specific adjustments, Bales testified that he would increase her dosages of Clozaril and Lamictal if he were her treating doctor.   He also referred to "other changes" he would make but did not elaborate further.   Bales maintained that Donna's mental illness is "treatable" and that she "may get more benefit from some medication adjustments."

¶10    When asked whether, even with adjustments to her medications, "there is a substantial probability that [Donna] would be a danger to herself or

others[,]" Bales agreed and testified that "[Donna] will not stay [at the treatment facility]" voluntarily and that, while he "[didn't] want to speculate on how [Donna] would be dangerous" if she was not committed, "she would be [dangerous]."

¶11     Townsend, Donna's case manager since 2016, testified that recommitment would be appropriate for Donna "due to her lack of insight into her mental illness and the need for medications."  Townsend held a videoconference with Donna on September 14, 2024.  Townsend testified that, while Donna was calm at the start of the conversation, she eventually became "agitated and emotional[,]" "demanded that [Townsend] contact[] the police so that the FBI could pick her up and take her to Madison," and "accused [Townsend] of making her fat."  Townsend testified that "[d]ue to [Donna] being emotional and agitated, [Townsend] had to end the meeting."  Townsend agreed with Bales that Donna would not take medications voluntarily.

¶12     At the conclusion of the hearing, the circuit court determined that there was substantial likelihood that Donna would become dangerous under the second, third, and fourth standards if her treatment were withdrawn.  The court found that Donna's "throwing" of "silverware at or near someone" would "certainly" satisfy the second standard of dangerousness to others.  The court also found that there was sufficient evidence of dangerousness under the third and fourth standards, relying on Bales' assessment that Donna was "nonsensical," "manic," that she "[could not] function outpatient safely," and that her comments regarding "wanting to be in Madison and having a soda pop" indicated a level of irrationality inconsistent with safely living independently.

¶13    The circuit court ordered Donna's commitment to be extended, finding that she was mentally ill and dangerous under the second, third, and fourth standards in combination with the recommitment alternative under WIS. STAT. § 51.20(1)(am).  The court also issued an order for involuntary medication and treatment, finding that Donna was "not competent to refuse psychotropic medication or treatment because [she] is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives[.]"  The court also found that Donna was "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to [her] condition in order to make an informed choice as to whether to accept or refuse psychotropic medications."

## DISCUSSION

¶14    An individual may be committed involuntarily if the petitioner proves by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous.  WIS. STAT. § 51.20(1)(a), 13(e). Section 51.20 sets forth five standards under which an individual may be found dangerous, all of which require proof of "recent acts, omissions, or behavior." *Sauk County v. S.A.M.*, 2022 WI 46, ¶5, 402 Wis. 2d 379, 975 N.W.2d 162; *see also* § 51.20(1)(a)2.a.-e.

¶15    To extend a commitment, the petitioner must establish the same three elements—mental illness, suitability for treatment, and dangerousness. *Langlade County v. D.J.W.*, 2020 WI 41, ¶31, 391 Wis. 2d 231, 942 N.W.2d 277. However, an individual who has been involuntarily committed and treated immediately prior to extension proceedings "may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment

ameliorated such behavior[.]" ***Portage County v. J.W.K.***, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509. Consequently, WIS. STAT. § 51.20 "provides a different avenue for proving dangerousness": in lieu of recent acts or behavior, the petitioner may establish dangerousness by proving "that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn[.]" ***J.W.K.***, 386 Wis. 2d 672, ¶19 (first quotation); § 51.20(1)(am) (second quotation). However, the County must still prove that the individual is dangerous because one of the five criteria for commitment under § 51.20(1)(a)2.a.-e. would recur if treatment were withdrawn. ***J.W.K.***, 386 Wis. 2d 672, ¶24.

¶16    A petition to extend an involuntary commitment must be supported by a written evaluation of the individual that sets forth the examiner's opinion on whether the individual meets the criteria for continued commitment. *See* WIS. STAT. § 51.20(13)(g)2r. If a circuit court concludes that sufficient evidence supports recommitment, it must "make specific factual findings with reference to [the standard(s) under] § 51.20(1)(a)2. on which the recommitment is based." ***D.J.W.***, 391 Wis. 2d 231, ¶40.

## I. Dangerousness

¶17    On appeal, Donna argues that the circuit court erred in finding that Donna is dangerous under the second, third, and fourth standards in combination with the recommitment alternative. Whether the court erred in determining that there was sufficient evidence to establish dangerousness under these standards is a question of law that we review de novo. *See **K.N.K. v. Buhler***, 139 Wis. 2d 190, 198, 407 N.W.2d 281 (Ct. App. 1987).

¶18    As to this first issue, this court concludes that the County did not provide sufficient evidence to prove dangerousness under the second standard. However, sufficient evidence was presented to establish dangerousness under the third and fourth standards, together with the WIS. STAT. § 51.20(1)(am) recommitment alternative.

¶19    In concluding that the second standard had been satisfied, the circuit court relied on Bales's testimony that Donna had been "aggressive historically" and that "without medication … she's been known to get assaultive." However, general allegations of past aggressive behavior fall short of the specific, factual findings which are necessary to support a finding of dangerousness. *See* ***D.J.W.***, 391 Wis. 2d 231, ¶59. The court also relied on Bales's assertion that he had learned of the incident in which Donna allegedly "threw silverware at another peer." But the County elicited almost no detail about this incident. It is not clear from the testimony what type of silverware was thrown, whether it was made of plastic, metal, or some other material, how close it came to hitting someone, or how forcefully it was thrown.[2] Absent such detail, all that remains are Bales's undeveloped assertions that Donna had been aggressive in the past and would be

---

[2] The silverware incident is mentioned in the memorandum from Townsend that was filed with the County's recommitment petition. Although the circuit court referred to the memorandum in its oral ruling, the County did not introduce it into evidence at the recommitment hearing, and the court referred to it only in identifying materials that Bales had reviewed in preparing his report. Because the report was not admitted into evidence, and the court does not appear to have directly relied on its contents in its oral ruling, this court will not consider the report in determining whether the County met its burden of establishing dangerousness. *See* ***Langlade County v. D.J.W.***, 2020 WI 41, ¶7 n.4, 391 Wis. 2d 231, 942 N.W.2d 277 (observing that because doctor's report was not received in evidence at recommitment hearing, County's evidence consisted solely of doctor's testimony); ***Washington Cnty. Hum. Servs. Dep't v. Z.A.Y.***, No. 2023AP447, unpublished slip. op. ¶16 (WI App Sept. 13, 2023) (disregarding evidence relied upon by circuit court to establish dangerousness that came from examining doctor's review of individual's records because doctor's report setting forth observations from record review was not admitted into evidence).

dangerous in some (unspecified) manner if her treatment stopped. This court concludes that the evidence was not sufficient to establish, to a clear and convincing degree, that if Donna's treatment were withdrawn, she would present "a substantial probability of physical harm to other individuals …" *See* WIS. STAT. § 51.20(1)(a)2.b.

¶20 Although the County did not meet its burden to establish dangerousness under the second standard, the circuit court did not err when it found that the County had satisfied the third and fourth standards for dangerousness. The record contains extensive evidence that Donna possesses "impaired judgment" such that, if her treatment were withdrawn, "there is a substantial probability of physical impairment or injury to … herself or other individuals." *See* WIS. STAT. § 51.20(1)(a)2.c. Likewise, under the fourth standard, there is sufficient evidence that, absent treatment, Donna's mental illness would render her "unable to satisfy basic needs for nourishment, medical care, shelter or safety" such that there is a "substantial probability" of "death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue" in the absence of "prompt and adequate treatment" of her mental illness. *See* § 51.20(1)(a)2.d.

¶21 Bales's report documents statements by Donna that evidence her impaired judgment and inability to provide for her own basic needs. He documents, for example, that Donna stated "all she needed was soda pop and money[,]" and that "medications were not good for the mind." He also noted that Donna has "spoken delusionally about the FBI" and has "ongoing mood swings."

¶22 Bales provided additional evidence on these points during his hearing testimony. He noted, for example, that Donna could not provide much

family history or background during his examination due to her "disorganization of thought." He described her as being "[n]onsensical, manic, disorganized in thinking" and exhibiting a "flight of ideas" during the examination. He described how she "just wants soda pop and her own apartment to be set up for her in Madison." Her presentation led Bales to conclude "that she would [not] be stable in that kind of arrangement for more than … a day or so" before "police … or some other intervention[]" would be necessary. And, Bales testified that he had "difficulty seeing how she could function" even in an outpatient setting. Finally, Bales affirmed multiple times that Donna would not voluntarily continue taking medication. Townsend concurred with this assessment; in her view, Donna lacked insight into her mental illness and would not voluntarily medicate.

¶23 Taken together, this evidence was sufficient to establish, under the third standard, that if her treatment were withdrawn, Donna would not continue to medicate voluntarily and, as a result, would exhibit "impaired judgment" that would give rise to "a substantial probability of physical impairment or injury to … herself …." *See* WIS. STAT. § 51.20(1)(a)2.c. Similarly, under the fourth standard, Bales' report and the hearing testimony established that, if Donna's treatment were withdrawn, her mental illness would leave her unable to satisfy her basic needs and give rise to a substantial probability of "death, serious physical injury, serious physical debilitation, or serious physical disease …." *See* § 51.20(1)(a)2.d. The circuit court did not err in determining that there was sufficient evidence to satisfy the third and fourth standards.

¶24 Donna does not directly challenge this evidence, but instead argues that, since the third and fourth standards for dangerousness provide that a substantial probability of impairment, injury, or harm does not exist if an individual "may be provided protective placement or protective services under"

11

Wisconsin's guardianship statute, WIS. STAT. ch. 55, the County "should have been required to explain why an alternative set of court orders was insufficient." To support this argument, Donna cites to *Dane County v. Kelly M.*, 2011 WI App 69, ¶3, 333 Wis. 2d 719, 798 N.W.2d 697. In *Kelly M.*, this court held that "individuals who are not already under [a Chapter 55 order] but who are a proper subject of such an order, come within the ch. 55 exclusion in the fifth standard [for dangerousness under WIS. STAT. § 51.20] if there are placement or services available under ch. 55 that would be effective …." *Kelly M.*, 333 Wis. 2d 719, ¶3.

¶25 This court is not persuaded by Donna's argument. First, *Kelly M.* did not establish that before a determination of dangerousness under the third and fourth standards can be made, a petitioner must show that placement or services under a guardianship is unavailable or insufficient. Nor did *Kelly M.* establish, despite Donna's assertions, that the County would bear the burden of establishing the same. Even so, the circuit court did find in this case that there was "no guardian to lend any assurance to this court or to Dr. Bales that [Donna] would be cared for properly if not in a locked facility." Further, Donna did not argue that the County must prove that protective placement or services is unavailable prior to a determination of dangerousness at the recommitment hearing. She raises it for the first time on appeal, and her argument is thinly developed. For these reasons, this court declines to address it further. *See Gibson v. Overnite Transp. Co.*, 2003 WI App 210, ¶9, 267 Wis. 2d 429, 671 N.W.2d 388 ("Generally, we will not consider on appeal arguments not made to the trial court."); *Wal-Mart Real Estate Business Trust v. Merrill*, 2023 WI App 14, ¶32, 406 Wis. 2d 663, 987 N.W.2d 764 ("We need not consider arguments that are undeveloped ….").

12

## II. Medication Order

¶26    Donna also argues that the involuntary medication order must be reversed because the County failed to prove that Donna received an adequate explanation of the advantages, disadvantages, and alternatives with respect to involuntary medication.  Specifically, Donna argues that the "evidence does not show the particular medication discussed with Donna during her … conversation with Dr. Bales[]" and that "Dr. Bales' description of side effects was insufficient."

¶27    Under Wisconsin law, an individual is not competent to "refuse medication or treatment if, because of mental illness … and after the advantages and disadvantages of and alternatives to accepting the particular medication … have been explained … [t]he individual is incapable of expressing an understanding of the advantages and disadvantages" of that medication or treatment.  WIS. STAT. § 51.61(1)(g)4.a.  Our supreme court has recognized the importance of "[a]ttention to detail" on the "issue of competency in a hearing on an involuntary medication order" and that such hearings "cannot be perfunctory under the law." *In re Melanie L.*, 2013 WI 67, ¶94, 349 Wis. 2d 148, 833 N.W.2d 607.  A person "subject to a[n] … involuntary medication order is entitled to receive … a reasonable explanation of proposed medication.  The explanation should include why a particular drug is being prescribed, what the advantages of the drug are expected to be," possible side effects of the drug, and "reasonable alternatives to the prescribed medication." *Id.*, ¶67.  The County "must prove that the person is substantially incapable of applying an understanding of the advantages and disadvantages of *particular* medication to her own mental illness." *See id.*, ¶94 (emphasis added).

¶28 Dr. Bales' report identifies five medications that Donna is receiving and indicates that he explained certain advantages, disadvantages, and alternatives to those medications to Donna. He explained that the advantages included "[s]tabilization of mood, improvement in reality orientation, improvement in sleep patterns, decrease in irritability and agitation," and a "decrease in anxiety." He explained the possible disadvantages were "[m]etabolic issues, such as weight gain; occasional issues with movement problems, such as tremors, restlessness, or tardive dyskinesia; occasional mild sedation[]" and "occasional gastrointestinal issues." The report also states that he identified "[p]sychotherapy, group therapy," and "stress management tactics" as alternatives to the recommended treatment to Donna.

¶29 Donna argues, however, that Dr. Bales' report and testimony lacked sufficient specificity to comply with *Melanie L.*, which requires that the explanation of treatment "should include why a *particular* drug is being prescribed," along with that particular drug's advantages, disadvantages, and alternatives. 349 Wis. 2d 148, ¶67 (emphasis added). She contends that the drugs she is receiving have many more than the four possible adverse side effects listed in the report, and that Bales did not explain in his testimony which medications he explained to her.

¶30 What seems clear from the record is that Bales identified the medications Donna is currently receiving and explained to her the advantages and disadvantages associated with those medications, as well as several treatment alternatives to medication. Although Bales did not specifically testify that he addressed each medication with Donna, it is reasonable to infer from his report and testimony that he did so. Moreover, though there may be more adverse side effects associated with the medications than are listed in Bales's report, this court

does not believe that it would be appropriate to require examining physicians to discuss with involuntarily committed individuals every side effect that has ever been associated with a particular medication. The severity and likelihood of adverse side effects manifesting in a particular patient are matters of professional medical judgment. Requiring a physician to identify and discuss every side effect ever associated with a particular drug would, in this court's view, unduly burden the examination process and frustrate an individual's ability to develop, much less express or apply, an understanding of the advantages and disadvantages of the medication to his or her particular circumstances. Absent a clear directive from our supreme court, this court is unwilling to impose such an obligation.

¶31    Having said that, this court is concerned about Bales' testimony that he was alarmed that Donna's medications had not been changed in years. Bales testified that he was so concerned that he attempted, without success, to reach the director of the facility in which Donna is confined about her medications. He testified that, if he were her treating physician, he would increase her dosages of Lamictal and Clozaril and would make other unspecified changes to her medications. This testimony is of concern given *Melanie L.*'s recognition that an involuntarily committed individual is entitled to "a reasonable explanation of *proposed* medication." *Melanie L.*, 349 Wis. 2d 148, ¶67 (emphasis added). Bales' testimony suggests he would propose different medications, but there is no evidence that he discussed with Donna the medications that he would actually propose or recommend. Instead, his report and testimony appear to indicate only that Bales and Donna discussed her current medication regimen. However, because Bales is not Donna's treating physician, and this court understands the County's recommitment request to be premised on her continuing on her current medication regimen, this court concludes that the evidence is sufficient to show

that she received an adequate explanation of the advantages, disadvantages, and alternatives associated with those medications.

¶32 For these reasons, the circuit court's orders extending Donna's involuntary commitment and permitting involuntary medication and treatment are affirmed.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

16